**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CHARLENE ALEXANDER,** | : | |
| **Plaintiff** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **MICHAEL J. ASTRUE,** | : | **No. 07-4913** |
| **Commissioner of the** | : | |
| **Social Security Administration,** | : | |
| **Defendant** | : | |

**<u>REPORT AND RECOMMENDATION</u>**

TIMOTHY R. RICE                                                        August 5, 2008
U.S. MAGISTRATE JUDGE

  Charlene Alexander seeks judicial review of the Administrative Law Judge's ("ALJ")

decision rejecting her application for Supplemental Security Income ("SSI"). Alexander claimed

she is disabled due to asthma, diabetes, hypertension, Hepatitis C, hypothyroidism, back and

neck pain, depression, and anxiety.  R. at 49-52, 55.  The ALJ found Alexander has not been

disabled within the meaning of the Social Security Act since May 16, 2005, the date her

application was filed. R. at 19.

  Alexander contends the ALJ committed reversible errors of law by failing to: (1) discuss

the results of a pulmonary functioning test Alexander claims establishes impairment, (2) ask the

vocational expert to explain any conflicts between the Dictionary of Occupational Titles

("DOT")[1] and his opinion work was available that did not require "repetitive" motion; and (3)

---

  [1]  The Dictionary of Occupational Titles is a United States Department of Labor
publication containing descriptions of the requirements for thousands of job in the national
economy.  <u>Martin v. Barnhart</u>, 240 Fed. Appx. 941, 943 (3d Cir. 2007).  The DOT, along with

include all medical impairments established by the record in the hypothetical questions posed to the vocational expert.   See Plaintiff's Brief and Statement of Issues in Support of Request for Review at 3-8, Alexander v. Astrue, No. 07-4913 (E.D. Pa. Filed Jan. 25, 2008) [hereinafter Plaintiff's Brief].

After careful review, I find the ALJ erred by failing to determine whether a conflict exists between the vocational expert's testimony and the DOT because the term "repetitive" was undefined.  Accordingly, I respectfully recommend Alexander's request for review be GRANTED and the matter be REMANDED to clarify the meaning of "repetitive" as the ALJ intended and as the vocational expert understood.  However, I find no error regarding the other contentions Alexander raised.  First, the ALJ considered Alexander's pulmonary functioning test but properly credited other evidence which established she is not disabled.  R. at 24-25.  Second, the hypothetical provided to the vocational expert included all credibly established limitations. See Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005).

## BACKGROUND

On May 16, 2005, Alexander applied for SSI, alleging disability as of March 1, 2003.  R. at 19.  Alexander filed a written request for a hearing, which took place on April 6, 2006.  Id. Alexander and vocational expert William M. O'Toole testified at the hearing.  The ALJ denied Alexander's claims on November 15, 2006.  R. at 28.

---

The Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles ("SCO") is the primary source of job requirements used to make disability determinations. Williams v. Barnhart, 424 F. Supp. 2d 796, 801 (E.D. Pa. 2006).

The ALJ found Alexander did not meet the insured status requirements of the Social

Security Act.  R. at 21-28.  The ALJ applied the five-step sequential analysis[2] to determine

Alexander's disability claim.  R. at 21-28.  At step one, the ALJ found Alexander had not

engaged in substantial gainful activity at any relevant time.  R. at 21.  At step two, the ALJ found

Alexander suffered from the following severe combination of impairments: asthma, high blood

pressure, hepatitis C[3], diabetes mellitus[4], hypothyroidism[5], and depression.  Id.  At step three, the

---

[2]  The Social Security Administration has adopted a system of sequential analysis for the evaluation of disability claims, which is codified at 20 C.F.R. § 416.920.  These steps are summarized as follows:

Step One:  If the claimant is working and the work is substantial gainful activity, a finding of not disabled is directed.  If not, proceed to Step Two.  20 C.F.R. § 416.920(a)(4)(I).

Step Two:  If the claimant is found not to have a severe impairment, or severe combination of impairments, which significantly limits his or her physical or mental ability to do basic work activity, a finding of not disabled is directed.  If there is a severe impairment, proceed to Step Three.  20 C.F.R. § 416.920(a)(4)(ii).

Step Three:  If the impairment meets or equals criteria for a listed impairment or impairments in Appendix 1 to Subpart P of Part 404 of 20 C.F.R., a finding of disabled is directed.  If not, proceed to Step Four.  20 C.F.R. § 416.920(a)(4)(iii).

Step Four:  If the claimant retains residual functional capacity to perform past relevant work, a finding of not disabled is directed.  If it is determined that the claimant cannot do the kind of work he or she performed in the past, proceed to Step Five.  20 C.F.R. § 416.920(a)(4)(iv).

Step Five: The Commissioner will then consider the claimant's residual functional capacity, age, education, and past work experience in conjunction with the criteria listed in Appendix 2 to determine if the claimant can adjust to other work or is disabled.  20 C.F.R. § 416.920 (a)(4)(v).

[3]  Hepatitis C is "inflamation of the liver." Dorland's Illustrated Medical Dictionary 856 (31st ed. 2007). [Hereinafter Dorland's].

[4]  Diabetes mellitus is "a chronic syndrome of impaired carbohydrate, protein, and fat metabolism owing to insufficient secretion of insulin or to target tissue insulin resistance."

ALJ found Alexander does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments.[6]  Id.

The ALJ found Alexander had the residual functional capacity ("RFC")[7] to lift/carry a maximum of twenty pounds occasionally and ten pounds frequently and sit/stand/walk for six hours in an eight-hour workday, with normal breaks.  R. at 23.  The ALJ also found "[h]er ability to push/pull is unlimited, other than by the lift/carry restriction stated above," and that "[s]he must avoid performing tasks which require repetitive motion."  Id.  Alexander has "no established postural, visual, communicative or environmental limitations.  Id.  Mentally, she is capable of performing simple, routine work that does not require prolonged periods of concentration."  Id.

The ALJ considered all of Alexander's symptoms to the extent they were consistent with

_____

Dorland's at 513.

[5] Hypothyroidism is "deficiency of thyroid activity, characterized by decrease in basal metabolic rate, fatigue, and lethargy . . . ."  Dorland's at 920.

[6]  The Listing of Impairments in Appendix 1, subpart P, Regulation No. 4 is a regulatory device used to streamline the decision-making process by identifying those claimants whose medical impairments are so severe they would be found disabled regardless of their vocational background.  Sullivan v. Zebley, 493 U.S. 521, 532 (1990).  The Listing defines impairments that would prevent an adult, regardless of age, education, or work experience, from performing "any" gainful activity, not just "substantial" gainful activity.  See 20 C.F.R. § 416.925(a) (purpose of the listings is to describe impairments "severe enough to prevent a person from doing any gainful activity").  The Listing was designed to operate as a presumption of disability making further inquiry unnecessary.  Sullivan, 493 U.S. at 532.

[7] RFC is "the most you can still do despite your limitations."  20 C.F.R. § 416.945(a).  Physical abilities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle.  20 C.F.R. § 416.945(b).  To determine the physical exertion requirements of work in the national economy, jobs are classified as sedentary, light, medium, heavy, and very heavy work.  20 C.F.R. § 416.967.

the evidence.  R. at 24.  The ALJ found Alexander's "medically determinable impairments could reasonably be expected to produce some of the alleged symptoms, but that [Alexander's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."  R. at 24.  He also stated Alexander offered numerous complaints, but very little evidence to support her case.  Id.

At step four, the ALJ found Alexander has no past relevant work, R. at 26, and at step five, the ALJ considered Alexander's age, education, work experience, and RFC in identifying jobs in the national economy Alexander could perform including fast food worker, office helper, and housekeeping cleaner.  R. at 27.

## FACTUAL HISTORY

Alexander was 51[8] at the time of the ALJ's decision and had completed ninth grade.  R. at 318.  She attended training school in 2005 for two to three months and attended GED classes for three weeks in 2006, but did not complete either program.  R. at 319-321.  She has almost no work experience, R. at 321, which she said was due to the birth of her two children and her abuse of alcohol and crack cocaine beginning at an early age.  R. at 321-322.  Alexander lives in transitional housing, and is responsible for cleaning her room and the bathroom.  R. at 328-329.

A.    Medical Evidence of Alexander's Alleged Physical Impairments

Alexander claimed disability due to diabetes, thyroid disorder, back, neck and shoulder

---

[8] Alexander is considered a "person closely approaching advanced age" under the Commissioner's regulations, which defines closely approaching advanced age as 50-54.  See 20 C.F.R. § 416.963(d).  Age is considered one of the relevant factors in determining whether a claimant can adjust to other work in the national economy.  Advancing age is "an increasingly limiting factor in a [claimant's] ability to make such an adjustment," 20 C.F.R. § 416.963(a); "age along with a severe impairment and limited work experience may seriously affect [a claimant's] ability to adjust to other work."  20 C.F.R. § 416.963(d).

pain, asthma, high blood pressure, and hepatitis C.  R. at 55-56.  Her medical history is

highlighted as follows:

- Alexander has a documented history of diabetes.  She testified her diabetes has

    caused blurry vision and weight gain, but no evidence exists of retinopathy[9] or

    symptomatic hypoglycemia.[10]  R at 229.  She has never been hospitalized, visited

    the emergency room, or been treated with insulin for diabetes.  Id.  Alexander has

    experienced no organ damage due to diabetes.  R. at 105.  Alexander admitted she

    does not stick to her diet, R. at 326, and her doctor noted she "eats

    indiscriminately."  R. at 298, 307.

- Alexander was diagnosed with hypothyroidism, R. at 238, and complains of

    fatigue.  October 4, 2004 medical records state her hypothyroidism was stable.  R.

    at 310.  February 2, 2005 medical records indicate her hypothyroidism was

    "controlled."  R. at 308.  A December 2006 neurological evaluation showed

    Alexander had mild global cognitive difficulties probably related to difficulty

    concentrating.  R. at 236.  Her doctor opined these symptoms support "diagnoses

    of hypothyroid-related cognitive impairment."  Id.  Alexander continues to be

    treated for hypothyroidism. R. at 237.

- Alexander testified she has chronic back, neck, and shoulder pain that is possibly

    due to a pinched nerve in her back.  Her only medication for the pain is Tylenol,

---

[9] Retinopathy is "inflamation of the retina." Dorland's at 1658-1659.

[10] Hypoglycemia is "an abnormally diminished concentration of glucose in the blood, which may lead to tremulousness, cold sweat, [goose bumps], hypothermia, and headache . . . ." Dorland's at 915.

which she takes eight or nine days per month.  X-rays of the lumbar spine in July

2005 and shoulder in May 2003 were normal.  R. at 188, 132.  A June 2003 exam

by Dr. Shapiro of the Bureau of Disability Determination noted some tenderness

in Alexander's high lumbar region and a mild restriction of her range of motion.

Id.  The exam also showed full motor strength and normal sensory and

neurological findings.  R at 232.

•     Alexander has never required hospitalizations or emergency room visits because

of asthma.  R. at 330.  In October of 2001, a pulmonary functioning test showed

Alexander had a "[m]oderate obstructive pattern with concomitant mild restrictive

defect [and] severe gas transfer abnormality."  R. at 136.  Subsequent progress

notes show no evidence of attacks or exacerbations.  R. 88-117.  Alexander's

medical records show one episode of dyspnea[11] but her Chronic Obstructive

Pulmonary Disease (COPD)[12] was stable with medication.  R. at 103, 108, 110,

111, 113.  On June 22, 2005, Dr. Shapiro noted under "History of Present Illness"

that Alexander has asthma, difficulty walking more than about two blocks,[13] and

wheezing.  R. at 229.  He also noted "shortness of breath can occur with exertions

---

[11] Dyspnea is "breathlessness or shortness of breath; difficult or labored respiration."
Dorland's at 859.

[12] "COPD (Chronic Obstructive Pulmonary Disease) is a serious lung disease that, over
time, makes it hard to breathe." U.S. Department of Health and Human Services, National
Institutes of Health, It has a Name: COPD, (2008),
http://www.nhlbi.nih.gov/health/public/lung/copd/index.htm.

[13] Alexander testified at the hearing she could walk four or five blocks or for about 15
minutes.  R at 330.

such as housework or exposure to dust ." R. at 229. Under "Physical

Examination" Dr. Shapiro said Alexander's lung fields are "clear" with no

"rales,[14] ronchi,[15] or wheezes." R. at 232. March 2006 progress notes from the J.

Edwin Wood Clinic document normal lung sounds. R. at 297.

• Alexander was diagnosed with high blood pressure, but has experienced no organ

damage due to the disease. R. at 105. Medical notes describe her high blood

pressure as "great" and under "excellent control." R. at 109, 111.

• Alexander has Hepatitis C., R. at 79, 102, but a liver biopsy showed normal

functioning and no disabling effects. R. at 79-82, 113. She has never required

therapy for Hepatitis. R. at 229.

B.   Medical Evidence of Alexander's Alleged Mental Impairments

In addition to her alleged physical impairments, Alexander claims she is unable to work

due to anxiety, depression, and mental disability. R. at 55-56. Alexander was diagnosed and

treated for major depressive disorder, social phobia, psychotic features, and post traumatic stress

disorder. R. at 219-223, 277. She has experienced change in appetite, sleep disturbance,

anxiety/panic attacks, grief over the death of her daughter, physical/sexual/emotional abuse by

her children's father, severe depressed mood, and hallucinations. R. at 219. She has a history of

alcohol and drug abuse, including intravenous drugs and crack cocaine. R. at 230. She

---

[14] Rales is "a discontinuous sound consisting of a series of short nonmusical noises, heard primarily during inhalation . . . ." Dorland's at 1600.

[15] Ronchi is "a whistling or snoring sound heard on auscultation of the chest when the air channels are partly obstructed." "Rhonchus." Merriam-Webster Online Dictionary, (2008), at http://www.merriam-webster.com/dictionary/rhonchus.

reportedly is in remission from her substance abuse.  R. at 244.

Alexander testified she keeps to herself, and is "not good with crowds."  R. at 332.  She also testified that she stopped taking GED classes because she "started getting stress, and it was too overwhelming."  R. at 334.  An initial psychiatric evaluation sheet and a transfer summary from Drexel Mental Health note Alexander has social phobia.  R. at 222, 260-270.  The transfer summary from Drexel Mental Health also noted she is "stable on medication."  R. at 269.

Dr. Min Yu, in an assessment of ability to do work-related activities, concluded Alexander had poor or no ability to follow work rules, relate to co-workers, deal with the public, interact with supervisors, deal with work stresses, function independently or maintain attention/concentration.  R. at 311.  However, according to Dr. Yu's treatment notes, she assigned Alexander global assessment of functioning (GAF)[16] scores from 60 to 75, R. at 222, 261-277, indicating mild to no symptoms for scores 61 to 75 and moderate symptoms for a score of 60.[17]  American Psychiatric Association, Diagnostic and Statistical Manual of Mental

---

[16] "Clinicians use a GAF scale to identify an individual's overall level of functioning, and a lower score 'may indicate problems that do not necessarily relate to the ability to hold a job.'" Ramos v. Barnhart, 513 F. Supp. 2d 249, 261 (E.D. Pa. 2007) (Yohn, J.) (quoting Lopez v. Barnhart, 78 Fed. Appx. 675, 678 (10th Cir. 2003)).  A physician's estimated GAF score of a claimant's overall level of functioning ability on a particular day may assist the ALJ, but is not essential to resolution of the claim.  Howard v. Comm'r of Soc. Sec., 276 F.3d 235, 241 (6th Cir. 2002).

[17] A GAF score of 71-80 means "[if] symptoms are present, they are transient and expectable reactions to psycho-social stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)."  A GAF score of 61-70 means "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  A GAF score of 51-60 means "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  A GAF score of 41-50 means "[s]erious symptoms (e.g.,

Disorders (DSM-IV-TR) 34 (4th ed. 2000).

Dr. Sadar, a state psychologist, reported Alexander "has limitations but has the mental RFC for basic, routine work."  R. at 224.

DISCUSSION

I.      Legal Standard

I must determine whether substantial evidence supports the Commissioner's final decision.  42 U.S.C. § 405(g); Rutherford, 399 F.3d at 552; Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999).  The factual findings of the Commissioner must be accepted as conclusive if they are supported by substantial evidence.  Richardson v. Perales, 402 U.S. 389, 390 (1971) (citing 42 U.S.C. § 405(g)); Rutherford, 399 F.3d at 552.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson, 402 U.S. at 401 (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); Reefer v. Barnhart, 326 F.3d 376, 379 (3d Cir. 2003).  It is "more than a mere scintilla but may be somewhat less than a preponderance of the evidence."  Rutherford, 399 F.3d at 552.  I may not weigh the evidence or substitute my own conclusions for that of the ALJ.  Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir. 2002).  If the ALJ's findings of fact are supported by substantial evidence, I am bound by those findings, even if I would have decided the factual inquiry differently. Fargnoli, 247 F.3d at 38.  At the same time, however, I must remain mindful that "leniency [should] be shown in establishing claimant's disability."  Reefer, 326 F.3d at 379 (quoting Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979)).

---

suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, *unable to keep a job*)."  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000), (emphasis added).

In addition, I retain "plenary review over the ALJ's applications of legal principles." Lee v. Astrue, 2007 WL 1101281, at *1 (E.D. Pa. Apr. 12, 2007) (Katz, J.) (citing Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995)).  Thus, I can overturn an ALJ's decision based on an incorrect legal standard even if I find it supported by substantial evidence.  Id. (citing Friedberg v. Schweiker, 721 F.2d 445, 447 (3d Cir. 1983)).

A claimant is disabled if she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905.  The claimant satisfies her burden by showing an inability to return to her past relevant work.  Rutherford, 399 F.3d at 551.  Once this showing is made, the burden shifts to the Commissioner to show the claimant, given her age, education, and work experience, has the ability to perform specific jobs existing in the economy.  20 C.F.R. § 416.920; see Rutherford, 399 F.3d at 551.

The ALJ may not make speculative inferences from medical evidence, see e.g., Smith v. Califano, 637 F.2d 968, 972 (3d Cir. 1981), but may reject conflicting medical evidence. Williams v. Sullivan, 970 F.2d 1178, 1187 (3d Cir. 1992).  When a conflict in the evidence exists, the ALJ may choose whom to credit, but "cannot reject evidence for no reason or for the wrong reason." Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993) (quoting Cotter v. Harris, 642 F.2d 700, 707 (3d Cir. 1981)); accord Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000). The ALJ must consider all the evidence and give some reason for discounting the evidence he rejects.  See Stewart v. Sec'y of HEW, 714 F.2d 287, 290 (3d Cir. 1983).

II.    The ALJ Must Clarify "Repetitive" as Used and Interpreted to Determine
           Whether the Vocational Expert's Testimony Conflicted with the DOT

Alexander argues the ALJ violated Social Security Ruling ("SSR") 00-4p, 2000 WL 1898704 by failing to resolve or inquire about conflicts between the vocational expert's testimony concerning the physical demands of the jobs Alexander could perform and the job descriptions in the DOT.  See Plaintiff's Brief at 6.  Alexander asserts a conflict exists between the vocational expert's testimony and the DOT because the ALJ's instruction Alexander could not perform jobs involving "repetitive" motion involving the wrists precluded her from "constant" and "frequent" motion.  See Plaintiff's Brief at 6-7.  The vocational expert testified Alexander could perform work as a fast food worker, an office helper, and a housekeeper/cleaner.  R. at 337.  According to the DOT, the fast food worker job requires "constant reaching and handling and frequent fingering," and the office helper and housekeeper jobs require "frequent reaching, handling, and fingering."[18]  See DOT Codes 311.472-010, 239.567-010, 323.687-014.  Alexander also argues the ALJ erred by not asking the vocational expert if any conflicts exist between the vocational expert's testimony and the DOT.  Id.

The ALJ has an "affirmative responsibility" to "identify and obtain a reasonable explanation for any conflicts between occupational evidence provided by [vocational experts] . . . and information in the [DOT]," and explain how the identified conflict was resolved.  SSR 00-04p, 2000 WL 1898704, at *3.  The rule "was designed to address the already-well-established . .

---

[18] The Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles ("SCO"), a companion book to the DOT, details the physical demands of each listed job.  Reaching, handling, and fingering are categorized in the SCO as either Not Present (N), Occasional (O), Frequent (F), or Constant (C).  "Repetitive" is not a frequency category listed in the DOT.

Not Present is "[a]ctivity or condition does not exist."  Occasionally is "[a]ctivity or condition exists up to 1/3 to 2/3 of the time."  Frequently is "[a]ctivity or conditions exists from 1/3 to 2/3 of the time."  Constantly is "[a]ctivity or condition exists 2/3 or more of the time."  SCO, App. C at C-3.

. obligation of an ALJ to develop the record during an adjudicative hearing." <u>Rutherford</u>, 399 F.3d at 556. The ALJ must "ask the vocational expert whether any possible conflict exists between the vocational expert's testimony and the DOT. . . ." <u>Burns v. Barnhart</u>, 312 F.3d 113, 127 (3d Cir. Pa. 2002). An unexplained conflict does not require remand if substantial evidence supports the ALJ's determination. <u>See Rutherford</u>, 399 F.3d at 557.

<u>Boone v. Barnhart</u>, 353 F.3d 203, 207 (3d Cir. 2003) and <u>Williams v. Barnhart</u>, 424 F. Supp. 2d 796, 801 (E.D. Pa. 2006) (Savage, J.) demonstrate a potential conflict exists between the vocational expert's testimony and the DOT. In <u>Boone</u>, the Third Circuit explained the claimant could not perform a sales attendant job because "[a]lthough sales attendant is an unskilled occupation with a light exertional level . . . the job involves frequent reaching, handling, and fingering, which Boone's limitation on repetitive hand activities may preclude." <u>Boone</u>, 353 F.3d at 207. The Court's reasoning suggests a restriction on repetitive motion will preclude a claimant from performing at least some jobs requiring frequent motion. <u>See id.</u>

In <u>Williams</u>, the ALJ asked the vocational expert to assume: "this individual could do light exertional work, however the individual would not be able to use her hands . . . there shouldn't be repetitive or continuous use of the hands . . . ." <u>Williams</u>, 424 F. Supp. 2d at 801. The court remanded the case because it was unclear what the ALJ meant, the vocational expert could not have known what the ALJ meant, and no one could conclude what the vocational expert understood the ALJ to have meant. <u>Id.</u> at 802. The Court held "there is a basis for the claimant's argument that frequent and repetitive are interchangeable. However, based on the record, frequent is not the only possible meaning of repetitive, nor can anyone be certain that is what the ALJ and [vocational expert] meant." <u>Id.</u>

The inherent ambiguity in the term "repetitive" requires an express definition to be

13

certain of its connotation.  See, e.g., White v. Barnhart, 2006 WL 328365, at *14  n. 5 (E.D. Pa.

Feb. 9, 2006) (RFC allowed "frequent fingering" yet not "repetitive motion" suggesting

repetitive has a meaning apart from frequent); Gardner v. Astrue, 257 Fed.Appx. 28, 30 n. 5 (9th

Cir. 2007) ( "'repetitively' in this context appears to refer to a qualitative characteristic- i.e., how

one uses his hands, or what type of motion is required- whereas 'constantly' and 'frequently'

seems to describe a quantitative characteristic- i.e., how often one uses his hands in a certain

manner"); Bennett v. Barnhart, 264 F. Supp. 2d 238, 258 (W.D. Pa. 2003) (vocational expert

stated repetitive pushing and pulling means "almost constant;" Sterling v. Astrue, 2008 WL

45415, at 4 (D. Kan. Jan. 2, 2008) (the vocational expert expressly construed the term

"repetitive" to mean "two-thirds to 100 percent of the time.").

   I am unable to determine whether substantial evidence supports the ALJ's decision

because the ALJ relied on the vocational expert's testimony after instructing the expert

Alexander had a restriction on repetitive motion.  Neither the ALJ nor the vocational expert

clarified the meaning of "repetitive."  Although there is a plausible distinction between repetitive

and frequent, see Gardner, 257 Fed.Appx. at 30 n.5, it is unclear whether the ALJ and vocational

expert grasped the distinction.  In any event, the question and answer suggest ambiguity that

could impact Alexander's eligibility for disability.  For example, the jobs the ALJ determined

Alexander can perform require varying degrees of reaching, handling, or fingering, which as a

matter of logic and practice may involve repetitive motion of the wrists.  See Boone, 353 F.3d at

208.  If the ALJ meant, or the vocational expert understood, "repetitive" to include frequent use,

a conflict exists because the jobs the vocational expert testified Alexander could perform

required at least frequent motion.  Accordingly, I respectfully recommend remand for

clarification of the meaning of "repetitive" as used by the ALJ and understood by the vocational expert.

III.    Alexander's Other Claims

I have reviewed Alexander's other claims and find the ALJ made no error in finding Alexander's October 2001 pulmonary functioning test did not establish disability. I also find the ALJ properly included all credibly established limitations in his hypothetical to the vocational expert. Remand on these issues is unwarranted.

A.    Substantial Evidence Supports the ALJ's Finding Alexander is Not Disabled Due to Asthma Despite the Results of Her Pulmonary Functioning Test

Alexander argues the ALJ failed to discuss and evaluate the results of pulmonary functioning testing[19] that allegedly establishes she meets Listings 3.02A and 3.02C.1 of the Listing of Impairments. See Plaintiff's Brief at 3-7. The ALJ concluded under step two Alexander has a severe combination of impairments based on medical findings of asthma, high blood pressure, hepatitis C, diabetes mellitus, hypothyroidism, and depression. R. at 21. At step three, however, the ALJ determined Alexander's asthma did not result in chronic asthmatic bronchitis with a forced expiratory volume "FEV[1]"[20] value equal to or less than the values specified in Table 1 of Listing 3.02A. R. at 22.

---

[19] Defendant argues the ALJ did not need to consider the pulmonary functioning test because it preceded the date Alexander alleged as the onset of disability. See Defendant's Response to District Court's Order to Show Cause and to Request for Review of Plaintiff at 10, Alexander v. Astrue, No. 07-4913 (E.D. Pa. Filed March 27, 2008). Because the ALJ did consider the test, I need not rule on this issue.

[20] "FEV[1]" is the amount of air that you can forcibly blow out in one second. The Free Dictionary, http://medical-dictionary.thefreedictionary.com/forced+expiratory+volume/ (last visited August 1, 2008).

Listing 3.02A provides: "Chronic obstructive pulmonary disease, due to any cause, with the FEV[1] equal to or less than the values specified in table corresponding to the person's height without shoes."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.02(A).  Alexander's height of 62 inches corresponds to an FEV[1] value of 1.15 or less.  Id.  Listing 3.02©) requires "[c]hronic impairment of gas exchange due to clinically documented pulmonary disease" along with a single breath diffusing capacity of the lung for carbon monoxide ("DCLO") score less than 10.5 ml/min/mm HG for Alexander's height of 62 inches or less than 40 percent of the predicted normal value.

The test results alone are insufficient to support a claim of disability.  Jones v. Barnhart, 364 F.3d 501, 504 (3d Cir. 2004).  The introductory note to the regulations governing listed respiratory impairments explains an FEV value "should not be analyzed in isolation from other evidence in [evaluating] whether the claimant satisfies the criteria for the listed impairment. Jones at 504."  It states:

> The listings in this section describe impairments resulting from respiratory disorders based on symptoms, physical signs, laboratory test abnormalities, and response to a regimen of treatment prescribed by a treating source.
> . . .
> Because the symptoms are common to many other diseases, a thorough medical history, physical examination, and chest x-ray or other appropriate imaging techniques are required to establish pulmonary disease.  Pulmonary function testing is required to assess the severity of the respiratory impairment once a disease process is established by appropriate clinical and laboratory findings.
> . . .
> Respiratory impairments usually can be evaluated under these listings on the basis of a complete medical history, physical examination, a chest x-ray or other appropriate imaging techniques, and spirometric pulmonary function tests.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.00; Jones 364 F.3d at 504.  "For a claimant to show his impairment matches a listing, it must meet all of the specified medical criteria.  An impairment

16

that manifests only some of those criteria, no matter how severely, does not qualify." Sullivan v. Zebley, 493 U.S. 521, 530 (U.S. 1990) (emphasis omitted); Jones 364 F.3d at 504.

In support of her claim of disability, Alexander cites an October 2001 pulmonary functioning test recording FEV[1] values of 1.11 and 1.06. R. 136. Alexander also cites her DLCO score of 8.76 in the October 2001 test as evidence she meets Listing 3.02©). R. at 136, Plaintiff's Brief at 4. The test, however, was almost two years before March 1, 2003, Alexander's alleged disability onset date. The record shows no pulmonary functioning tests after Alexander's alleged disability onset date.

The ALJ gave several reasons why Alexander failed to meet the Listings. Although the ALJ may have erroneously stated Alexander does not meet Listing 3.03 because "[her asthma] does not result in chronic asthmatic bronchitis with an FEV1 value equal to or less than the values specified in Table 1 of Listing 3.02A," he nevertheless cited other substantial evidence. R. at 22. First, the ALJ noted Alexander's asthma "does not cause attacks in spite of prescribed treatment requiring physician intervention at least once every [two] months.[21]" R. at 22. Second, Dr. Chang's "progress notes through May 2005 contain no evidence of attacks or exacerbations and only one complaint of dyspnea on exertion with her COPD consistently described as stable . . . ." R. at 24-25. Third, the ALJ cited Dr. Shapiro's examination, which showed Alexander's lung fields are "clear" with no "rales, ronchi, or wheezes," R. at 232, and progress notes which showed normal lung sounds. R. at 24-25, 297. Finally, the ALJ noted Alexander has never needed to go to the emergency room because of an asthma attack. R. at 25.

---

[21] In absence of bi-monthly treatment notes in the record, I assume the ALJ meant Alexander's asthma does not cause attacks despite her failure to attend bi-monthly treatment.

The ALJ's decision, read as a whole, establishes the ALJ considered the appropriate factors in determining Alexander did not meet the requirements of any listing. See Jones, 364 F.3d at 505. Although a single pre-onset test in October 2001 suggests Alexander may have partially satisfied the listings, the ALJ had substantial evidence to find Alexander's overall medical history since 2003 fails to establish pulmonary disease that meets listings. See id. Remand for additional analysis is unwarranted. See Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005) (harmless error not affecting the outcome of the case fails to merit remand); Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) ("[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").

   B.    The ALJ Included all of Plaintiff's Medical Impairments Established by the
         Record in His Hypothetical Question Posed to the Vocational Expert

Alexander claims the ALJ also erred by failing to include all of Alexander's medically established impairments. R. at 8-9. Specifically, Alexander alleges the ALJ should have imposed restrictions regarding her social functioning and environmental limitations due to asthma. Id.

Only those limitations found by the ALJ to be supported by the record need to have been included in the hypothetical to the vocational expert, see Plummer v. Apfel, 186 F.3d 422, 431 (3d Cir. 1999), McGonigal v. Barnhart, 153 Fed. Appx. 60, 62 (3d Cir. 2005). The ALJ properly included all impairments supported by substantial evidence.

The ALJ is not required to include every impairment alleged by a claimant in the hypothetical. Rutherford, 399 F.3d at 554. Rather, the ALJ must accurately convey to the vocational expert all of a claimant's credibly established limitations. Id. Vocational expert

testimony is not substantial evidence unless it includes all credibly established limitations that are medically supported and uncontroverted in the record.  Id. (citing Burns, 312 F.3d at 123). However, a limitation that is medically supported, but contradicted by other evidence in the record, may or may not be found credible.  Id.  The ALJ may choose to credit portions of the evidence but "cannot reject evidence for no reason or for the wrong reason."  Id. (quoting Mason, 994 F.2d at 1066).  Finally, a limitation asserted by the claimant that lacks objective medical support may still be considered credible.  Rutherford, 399 F.3d at 554.  "In that respect the ALJ can reject such a limitation if there is conflicting evidence in the record, but should not reject a claimed symptom that is related to an impairment and is consistent with the medical record simply because there is no objective medical evidence to support it."  Id.

First, restrictions regarding Alexander's social functioning are not credibly established limitations.  Although a medical source statement from Min Yu, M.D. noted Alexander had poor to no ability in all areas of making occupational adjustments, the ALJ chose not to credit the statement after carefully examining all the evidence.  R. at 26.  Instead, the ALJ found contemporaneously written treatment notes by Dr. Yu were more reliable than the medical source statement provided for the sole purpose of assisting Alexander in obtaining disability benefits. R. at 26.  Dr. Yu assigned Alexander GAF scores from 60 to 75, R. at 222, 261-277, which indicate mild to no symptoms for scores 61 to 75 or moderate symptoms for 60.  DSM-IV-TR at 34.  The DSM-IV-TR does not identify job retention as problematic until scores fall below 51. Because of the inconsistency between Dr. Yu's assessment of disability and her treatment notes,[22]

---

[22] A treating source's opinion is entitled to controlling weight when it is supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with other substantial evidence in the record.  See 20 C.F.R. § 416.927(d)(2); SSR 96-2p, 1996 WL 374188.

19

the ALJ instead relied upon Dr. Sadar, a state psychologist, who reported Alexander "has limitations but has the mental RFC for basic, routine work."  R. at 224.

Second, restrictions with regard to "environmental irritants such as dust, fumes, odors, gases, and the like" also were not credibly established limitations.  See Rutherford, 399 F.3d at 554.  Although Dr. Shapiro noted "shortness of breath can occur with exertions such as housework or exposure to dust," R. at 229, Dr. Shapiro also acknowledged Alexander's lung fields are "clear" with no "rales, ronchi, or wheezes."  R. at 232.  Alexander complained only once of shortness of breath, which was on exertion.  R. at 137.  Progress notes by Alexander's treating physicians show no evidence of asthma attacks or exacerbations.  R. 88-117.  March 2006 medical records document normal lung sounds, R. at 297, and Alexander has never been hospitalized for asthma.

Accordingly, I make the following:

---

A treating source's opinion may be rejected "on the basis of contradictory medical evidence," Plummer, 186 F.3d at 429, or if unsupported by sufficient clinical data, Newhouse v. Heckler, 753 F.2d 283, 286 (3d Cir. 1985).

**R E C O M M E N D A T I O N**

AND NOW, this 5th day of August, 2008, it is respectfully recommended that
Alexander's request for review be GRANTED and the matter be REMANDED to the
Commissioner on the issue of whether the vocational expert's opinion conflicted with the
Dictionary of Occupational Titles.  The Commissioner may file objections to this Report and
Recommendation within 10 days after being served with a copy thereof.  <u>See</u> Local Civ. Rule
72.1.  Failure to file timely objections may constitute a waiver of any appellate rights.  <u>See</u> <u>Leyva</u>
<u>v. Williams</u>, 504 F.3d 357, 364 (3d Cir. 2007).


BY THE COURT


<u>/s/ TIMOTHY R. RICE</u>
TIMOTHY R. RICE
U.S. MAGISTRATE JUDGE